FILED
SEP 11 2026
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

(5)
IFP, no summons issued

Sunny Jean Yow
2022 Blake Street
Berkeley, CA 94704
Tel: 510-575-0563
berkeleypeoplepower@gmail.com
*Pro Se Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNNY JEAN YOW,<br>Plaintiff,<br>vs.<br>CITY OF BERKELEY, THOMAS GREGORY; MIKE ST. PIERRE PETER RADU; DOES 1-20 | Case No.: ______________<br>COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF<br>(1) Americans with Disabilities Act, Title II<br>(2) Rehabilitation Act, Section 504<br>(3) 42 U.S.C. § 1983 — Fourth Amendment<br>(4) 42 U.S.C. § 1983 — Fourteenth Amendment<br>(5) Declaratory and Injunctive Relief<br>DEMAND FOR JURY TRIAL |

CV26 10262 RFL

## I. INTRODUCTION

1. The City of Berkeley destroyed Sunny Jean Yow's home, her art, and her belongings; arrested her; took the telephone by which she could be reached; and then set about killing her dog through a proceeding it never told her about. When she found out anyway and came to the shelter, an Assistant to the City Manager pushed a waiver of her right to counsel at her three times, and then refused to let her see the dog.

2. Ms. Yow is unhoused and disabled. She is an adult survivor of childhood meningitis and lives with PTSD and a brain injury. Her disabilities impair her executive functioning, her decision-making, and her ability to handle sudden change. Under [handwritten insertion: undo] stress she becomes overwhelmed, freezes, and cannot think clearly or act quickly.

3. Her dog Griz was born on her lap, in her bed, five years ago. She had his mother and has raised him since birth. He alerts her to threats and physically guards her. He helps her move and pulls the cart carrying her belongings. He is trained as a livestock guardian and holds a small perimeter off-leash, returning immediately when called.

3(a). On July 23, 2026, Ms. Yow consented to representation by the Berkeley Homeless Union. Declaration of Yesica Prado (ECF 349) ¶ 3. Union President Yesica Prado found Ms. Yow at her encampment on Murray Street while searching for relocation sites for people at 8th and Harrison. Ms. Yow told Ms. Prado that her encampment had been noticed for a sweep and that she needed the Union's help. *Id.*

4. On July 28, 2026, a written request for reasonable accommodations under Title II of the Americans with Disabilities Act was submitted on Ms. Yow's behalf to the City's own ADA Program Coordinator. It identified her disabilities and asked, among other things, for "Cognitive and Communication Accommodations." The City never determined it. The interactive process was never completed.

4(a). On August 14, 2026, Defendant Gregory issued a written determination on the July 28 request. Declaration of Yesica Prado (ECF 341-1) ¶ 12 & Exhibit A. He granted the request for physical relocation assistance "to the extent that Ms. Yow needs such support due to disability," and directed Ms. Yow to contact Okeya Vance-Dozier to schedule assistance. Id. He granted an extension of time to move, setting a new compliance deadline of August 25, 2026. Id. He agreed to provide replacements of survival gear discarded during abatement, consistent with the Court's order in the related case. Id. He approved Ms. Yow's request to have a BHU advocate present

during interactions with City staff. Id. He denied the request for a stable location, stating that "the identification of sites suitable for camping is not a service the City provides." Id. He denied the exemption from the 3x3 rule at Ms. Yow's current location, citing the City's need to clean the area, but stated that Ms. Yow "is invited to propose an alternative location outside of the noticed area, or the City can evaluate the Murray and 9th location for a potential 3x3 accommodation after August 21." Id. He requested further information about why Ms. Yow needed 350 square feet, asking how much surface space her art supplies and completed artworks occupy and how much space is required for her to work on new artworks. Id. He denied the request for "trauma-informed communication" as vague, stating that the phrase "is a broad concept" and that the City "cannot agree to provide an unspecified accommodation." Id. He stated that he had met with Ms. Yow once, on August 11, 2026, and had conducted an initial assessment of the block. Id. He stated that he would "only conduct future meetings with Ms. Yow if she first puts the dogs on a leash or otherwise restrains them." *Id.*

4(b). On August 20, 2026, Defendant Gregory sent a correction to his August 14 determination, stating that where he had typed "August 14-21" he should have typed "August 21-28," and where he had typed "August 21" he should have typed "August 28." Declaration of Yesica Prado (ECF 341-1) ¶ 12 & Exhibit A.

4(c). On August 25, 2026, Ms. Prado responded to the August 14 determination. Declaration of Yesica Prado (ECF 341-1) ¶ 8 & Exhibit A. She asked the City to provide a written determination on the approved footprint and location, including written confirmation that Ms. Yow could relocate to the site before the abatement operations. Id. She provided the information Defendant Gregory had requested about why Ms. Yow needed 350 square feet: (1) a tent large

enough for her to stand in, with room for her emotional support dog, belongings, and space to sleep and rest; (2) space to store her art projects and supplies, which are essential to managing her PTSD; (3) storage for essential survival equipment, clothing, and personal items; (4) sufficient space to move within her footprint without feeling cramped or tripping over her belongings; and (5) adequate space for her emotional support dog to rest and move comfortably. Id. She asked the City to propose the maximum footprint available if it would not approve the full 10' x 35' footprint. *Id.* She requested a further extension of time to move, given that Ms. Yow had not yet received a final determination on her 3x3 exemption. Id. She asked the City to provide the largest tent it could provide, as well as replacements for any other essential survival equipment destroyed. Id. She asked the City to honor its documented commitments to accommodate communication-related disabilities. Id. She informed the City that she would tell Ms. Yow of the requirement to leash or restrain her dogs during meetings, and noted that the dogs are her emotional support animals and essential to managing her PTSD. *Id.*

4(d). On August 25, 2026 at 6:56 p.m., Defendant Gregory responded. Declaration of Yesica Prado (ECF 341-1) ¶ 8 & Exhibit A. He stated that "the City has completed the interactive process regarding Ms. Yow's requests." Id. He stated that "while further discussion can be had regarding the size of footprint she would like to maintain, that is separate from the accommodations related to the abatement, which you have been provided final determinations for." Id. He stated that the City "does not identify sites suitable for camping, nor has it been ordered to do so." Id. He stated that he had "not 'denied Ms. Yow's requested exemption at her current location,'" and that he had "evaluated a site on the south side of Murray, about 80-100 feet west of the site you identified below in this thread as Ms. Yow's current campsite." Id. He

stated that he had "already informed Ms. Yow that her requested 10' x 35' footprint could fit," and that "she may return to the location after the City obtains full access to the area to clean and address hazards." Id. He stated that "no further assessment is possible or necessary at this time as the City first needs to clean the area and address the hazards present." Id. He stated that "Ms. Yow may return after August 28, once the City has had an opportunity to clean the streets and sidewalk." Id. He stated that he was "glad to continue discussing the requested footprint," and repeated his request for information about how much surface space Ms. Yow's art supplies and completed artworks occupy and how much space is required for her to work on new artworks. Id. He stated that he did "not need to meet with BHU or Ms. Yow." Id.

4(e). On August 25, 2026, after Ms. Prado's response to the August 14 determination, Defendant Gregory also sent an email providing "time-sensitive information about Sunny Jean Yow's dogs." Declaration of Yesica Prado (ECF 341-1) ¶ 12 & Exhibit A. He stated that Berkeley Animal Care Services ("BACS") had impounded Ms. Yow's dog Griz on Saturday, August 22, 2026, and that her other dog, Kitty, had been impounded on Wednesday, August 26, 2026. Id. He stated that BACS had "made multiple attempts to contact Ms. Yow to provide information about retrieving her dogs, but they were unable to get through using the phone number they have on file for her." Id. He stated that Ms. Yow had "five days from today to retrieve both dogs from the Animal Shelter at 1 Bolivar Dr. in Berkeley," and that "the shelter is open on Saturday, so that is the final day to retrieve the dogs." Id. He stated that Griz had been determined to be vicious and dangerous, and that Ms. Yow would "need to comply with City regulations that apply to keeping such dogs, including presenting proof of insurance in order to retrieve the dog." Id. He stated that Ms. Yow could appeal the determination as provided in the attached letter, and that pursuant to

BMC 10.04.200, failure to retrieve Kitty prior to 4 p.m. on Saturday could result in the City making the dog available for adoption or humanely euthanizing the dog. Id. He stated that failure to appeal the vicious and dangerous determination, or failure to retrieve Griz under the conditions provided, would result in the City humanely euthanizing the dog. Id.

4(f). On August 31, 2026 at 2:52 p.m., Defendant Gregory emailed Ms. Prado a letter with the "vicious dog" determination from Berkeley Animal Services. Declaration of Yesica Prado (ECF 349) ¶ 10. The letter is dated August 31, 2026 and is addressed to Ms. Yow. Declaration of Yesica Prado (ECF 341-1) ¶ 12 & Exhibit B. It states that BACS "has completed its investigation regarding Griz and his documented history and recent incidents," and that "BACS has determined that Griz meets the criteria for designation as a vicious and dangerous dog pursuant to Berkeley Municipal Code § 10.04.170." Id. It states that the determination is based on "the totality of Griz's documented history," including "one documented bite incident," "a history of being off leash and engaging in threatening behavior toward members of the public and City employees," and an incident on August 22, 2026, when Griz was "found tethered and unattended in a parking lot after reportedly being left at the location for several hours with no owner or responsible person present." Id. It states that when BACS employees attempted to retrieve Griz, "he growled as they approached, lunged at staff, and repeatedly bit the control poles used to safely restrain him, destroying two of them in the process," and that after being secured, "Griz continued attempting to bite staff and ultimately required sedation before he could be safely transported due to the risk of a bite." Id. It states that pursuant to BMC § 10.04.172(C), Ms. Yow is "entitled, upon request, to an administrative hearing regarding this determination, provided that the hearing is requested within five working days of this notification." Id. It states that if Ms.

Yow does not contest the determination or fails to request a hearing, "the determination will stand," and that she "must retrieve your dog within five working days of this notification" and comply with BMC § 10.04.172 by keeping the dog securely confined indoors or in a securely enclosed and locked pen or dog run area upon her premises. Id. It states that the dog "may not leave your premises unless securely muzzled and restrained with a chain," and that Ms. Yow "must carry a policy of insurance in an amount of not less than $50,000." Id. It states that the City "will not release the dog to you without proof of such insurance policy as described in BMC § 10.04.171.B." Id. It states that failure to retrieve the dog under these conditions, or request a hearing, "will result in the City humanely euthanizing the dog." Id.

4(g). On September 5, 2026, Ms. Prado located Ms. Yow and went with her to the animal shelter to pick up the dog that had been captured during the abatement. Declaration of Yesica Prado (ECF 349) ¶ 18. When Ms. Prado walked into the shelter with Ms. Yow, she noted that she was Ms. Yow's representative. Id. ¶ 19. Animal Services Officer White informed Ms. Prado about Griz and BACS' determination. Id. His tone was demeaning towards Ms. Yow, as he said to Ms. Prado that Ms. Yow was not capable of taking care of her dog. Id. Ms. Prado believes that being a person with a disability does not disqualify you from being able to take care of an animal. Id. ¶ 20. Ms. Yow has had this dog since birth and has taken good care of him. Id.

4(h). On September 5, 2026, Ms. Prado was informed at the animal shelter that Griz is presently impounded and is not at large. Declaration of Yesica Prado (ECF 341-1) ¶ 22. While impounded, he poses no danger to any member of the public. Id.

4(i). On September 9, 2026, Ms. Yow was located shortly before the hearing and appeared at the Berkeley Animal Shelter. Declaration of Yesica Prado (ECF 349) ¶ 2. Neither Ms. Prado nor Mr. Prince, her attorney, had seen her in at least a week. Id. Ms. Prado had driven all over Berkeley day after day unable to find her. Id. Ms. Yow became upset when the hearing officer declared that he would not re-schedule the hearing to either September 16 or September 17 so that Mr. Prince could adequately prepare. Id. Ms. Yow began pleading her case, becoming extremely agitated, begging to see her dog, and begging the City to release Griz to her care. Id. The representative of the Shelter announced that she didn't believe Ms. Yow could take care of her dog, further provoking Ms. Yow. Id. Mr. Prince intervened as Ms. Yow became increasingly triggered and upset, at one point producing a muzzle that she insisted she would put on the dog if only the City would release him. Id. It was clear from the outset that the City had no intention of conducting a genuine hearing. Id. To go forward as the hearing officer insisted he would under these conditions would have been nothing but a fraud and a "kangaroo court." Id.

4(j). On September 9, 2026 at 11:22 a.m., Mr. Prince wrote to Animal Services and Deputy City Attorney Sara Stephens. Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C. He asked for the name and contact information of the hearing officer. Id. He stated that the City had "no legal right to go forward with a hearing without the owner of the dog, my client Sunny Yow, who the City itself stated is an essential witness and who, under California law, has a right to be present." Id. He stated that the dog is "presently impounded at the Berkeley Humane Society so presents no danger to the public." Id. He stated that "we have had difficulty reaching Ms. Yow, largely because when she was arrested, Berkeley Police seized her cell phone in addition to the difficulties that Union president Yesica Prado provided previously." Id. He stated that "as a

person with a disability, Ms. Yow is entitled to reasonable accommodations and before this hearing can go forward, the interactive process must be completed." Id. He stated that "to go forward without her legal counsel having had an opportunity to meet with Ms. Yow and otherwise prepare for the hearing, the City will have deprived her of the legal representation that she is entitled to under the law." Id. He stated that "should the hearing go forward and the City takes any adverse action whatsoever with regard to my client's support animal, 'Griz' it will have done so at its peril." Id. He stated that "you have provided no legal justification to go forward with today's hearing and if you do not confirm by 11:45 am that today's hearing will be canceled and rescheduled, I reserve the right to immediately seek judicial intervention." Id.

4(k). At 10:56 a.m. on September 9, 2026, Ms. Stephens responded: "As of right now, the hearing is still scheduled for 1:45pm today." Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C.

4(l). At 1:06 p.m. on September 9, 2026, the City postponed the hearing to September 10, 2026 at 10:00 a.m. Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C. At 1:32 p.m., the City stated that it "cannot agree to any further extension"; that "you have not made a reasonable accommodation request for Ms. Yow"; that "the City cannot accept an accommodation request for [Ms. Yow] from" her attorney; and that it would not "engage in the interactive process with someone you cannot reach." Id. It added that it "has already delayed euthanasia significantly." Id.

4(m). On September 5, 2026 at 11:37 a.m., Mr. St. Pierre transmitted the City's evidentiary file to Mr. Prince, consisting of nine categories of documents: an EPD contact notice from March 18, 2026; two screenshots of a text conversation with photos of Ms. Yow's dogs sent in by a

complainant (complainant's phone number redacted); kennel details for Griz; medical records for Griz; memos for Griz (bite victim and complainant contact information redacted); a bite report for Griz; a spay/neuter hearing decision letter for Griz; history and memos for Ms. Yow (bite victim and complainant contact information redacted); and the letter to Ms. Yow after the investigation on potential vicious or dangerous designation. Declaration of Yesica Prado (ECF 341-1) ¶ 19 & Exhibit D. He stated that these documents "have been sent to the hearing officer as well," and that he would be out of the office Monday through Wednesday — that is, through the day of the hearing. Id. He stated that Senior Animal Control Officer London Rivera would be onsite. Id.

4(n). On September 8, 2026 at 4:38 p.m., Mr. Prince wrote to Mr. St. Pierre, copying Ms. Stephens and others. Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C. He stated that he would be representing Ms. Yow, but that he had been out of town from Thursday of the previous week until yesterday and that "we will not be able to go forward with tomorrow's hearing." Id. He stated that he had "not had a chance to review the documentation you provided nor to meet with Ms. Yow who we are having difficulties reaching and has been deemed an essential witness." Id. He stated that "the earliest I can be available will be Sept. 16 or 17." Id.

4(o). On September 9, 2026 at 7:16 a.m., Ms. Stephens responded that a delay "poses a number of operational and safety concerns." Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C.

5. On July 29, 2026, the City's ADA Program Coordinator wrote that "the City will not proceed with the previously planned abatement," and that Ms. Yow "will be provided with a new notice once the abatement is rescheduled."

6. On August 26, 2026, the City abated her encampment anyway. Officers put on rubber gloves. They destroyed her found-object bureau — her art and her exhibits. They took everything. They arrested her for what she was told was "illegal lodging." During the abatement she asked for a mental health professional to communicate with her. None was provided. No accommodation of any kind was provided.

7. Ms. Yow was never notified that her dogs had been impounded. She learned from other unhoused people that Griz had been taken to the shelter and scheduled for euthanasia before she knew he was there. She was then told he had already been killed, and she grieved him for a week.

8. She did not receive the City's "vicious and dangerous" determination letter from the City. Her Union representative handed her a copy on September 5, 2026. The letter did not state a hearing date or time.

9. The City nonetheless proceeded to adjudicate Griz's life, refused a short continuance, and told her attorney in writing that it "cannot accept an accommodation request for her from you," that it would not "engage in the interactive process with someone you cannot reach," and that it "has already delayed euthanasia significantly."

9(a). The City's assertion that no accommodation request had been made was false. A detailed request, with an express disability nexus, had been submitted to the City's ADA Program Coordinator on July 28, 2026 and never determined. Declaration of Yesica Prado (ECF 341-1) ¶ 4 & Exhibit A. A second request specific to the hearing was submitted on September 3, 2026. Id. ¶ 14. Both were made by the Union representative Ms. Yow designated and to whom the City had been directing communications. Id. ¶ 15

10. A public entity may not destroy the means by which a disabled person can be contacted and

then treat her unreachability as a reason to deny her the process the law requires.

10(a). On September 5, 2026, Ms. Prado located Ms. Yow and went with her to the animal shelter. Declaration of Yesica Prado (ECF 349) ¶ 18. When Ms. Prado walked into the shelter with Ms. Yow, she noted that she was Ms. Yow's representative. Id. ¶ 19. Animal Services Officer White informed Ms. Prado about Griz and BACS' determination. Id. His tone was demeaning towards Ms. Yow, as he said to Ms. Prado that Ms. Yow was not capable of taking care of her dog. Id. Ms. Prado believes that being a person with a disability does not disqualify you from being able to take care of an animal. Id. ¶ 20. Ms. Yow has had this dog since birth and has taken good care of him. Id.

10(b). On September 9, 2026, Ms. Yow was located shortly before the hearing and appeared at the Berkeley Animal Shelter. Declaration of Yesica Prado (ECF 349) ¶ 2. Neither Ms. Prado nor Mr. Prince had seen her in at least a week. Id. Ms. Prado had driven all over Berkeley day after day unable to find her. Id. Ms. Yow became upset when the hearing officer declared that he would not re-schedule the hearing to either September 16 or September 17 so that Mr. Prince could adequately prepare. Id. Ms. Yow began pleading her case, becoming extremely agitated, begging to see her dog, and begging the City to release Griz to her care. Id. The representative of the Shelter announced that she didn't believe Ms. Yow could take care of her dog, further provoking Ms. Yow. Id. Mr. Prince intervened as Ms. Yow became increasingly triggered and upset, at one point producing a muzzle that she insisted she would put on the dog if only the City would release him. Id. It was clear from the outset that the City had no intention of conducting a

genuine hearing. Id. To go forward as the hearing officer insisted he would under these conditions would have been nothing but a fraud and a "kangaroo court." Id.

10(c). On September 9, 2026 at 11:22 a.m., Mr. Prince wrote to Animal Services and Deputy City Attorney Sara Stephens. Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C. He asked for the name and contact information of the hearing officer. Id. He stated that the City had "no legal right to go forward with a hearing without the owner of the dog, my client Sunny Yow, who the City itself stated is an essential witness and who, under California law, has a right to be present." Id. He stated that the dog is "presently impounded at the Berkeley Humane Society so presents no danger to the public." Id. He stated that "we have had difficulty reaching Ms. Yow, largely because when she was arrested, Berkeley Police seized her cell phone in addition to the difficulties that Union president Yesica Prado provided previously." Id. He stated that "as a person with a disability, Ms. Yow is entitled to reasonable accommodations and before this hearing can go forward, the interactive process must be completed." Id. He stated that "to go forward without her legal counsel having had an opportunity to meet with Ms. Yow and otherwise prepare for the hearing, the City will have deprived her of the legal representation that she is entitled to under the law." Id. He stated that "should the hearing go forward and the City takes any adverse action whatsoever with regard to my client's support animal, 'Griz' it will have done so at its peril." Id. He stated that "you have provided no legal justification to go forward with today's hearing and if you do not confirm by 11:45 am that today's hearing will be canceled and rescheduled, I reserve the right to immediately seek judicial intervention." Id.

10(d). At 10:56 a.m. on September 9, 2026, Ms. Stephens responded: "As of right now, the hearing is still scheduled for 1:45pm today." Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C.

10(e). At 1:06 p.m. on September 9, 2026, the City postponed the hearing to September 10, 2026 at 10:00 a.m. Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C. At 1:32 p.m., the City stated that it "cannot agree to any further extension"; that "you have not made a reasonable accommodation request for Ms. Yow"; that "the City cannot accept an accommodation request for [Ms. Yow] from" her attorney; and that it would not "engage in the interactive process with someone you cannot reach." Id. It added that it "has already delayed euthanasia significantly." Id.

10(f). On September 5, 2026 at 11:37 a.m., Mr. St. Pierre transmitted the City's evidentiary file to Mr. Prince, consisting of nine categories of documents: an EPD contact notice from March 18, 2026; two screenshots of a text conversation with photos of Ms. Yow's dogs sent in by a complainant (complainant's phone number redacted); kennel details for Griz; medical records for Griz; memos for Griz (bite victim and complainant contact information redacted); a bite report for Griz; a spay/neuter hearing decision letter for Griz; history and memos for Ms. Yow (bite victim and complainant contact information redacted); and the letter to Ms. Yow after the investigation on potential vicious or dangerous designation. Declaration of Yesica Prado (ECF 341-1) ¶ 19 & Exhibit D. He stated that these documents "have been sent to the hearing officer as well," and that he would be out of the office Monday through Wednesday — that is, through the day of the hearing. Id. He stated that Senior Animal Control Officer London Rivera would be onsite. Id.

10(g). On September 8, 2026 at 4:38 p.m., Mr. Prince wrote to Mr. St. Pierre, copying Ms. Stephens and others. Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C. He stated that he would be representing Ms. Yow, but that he had been out of town from Thursday of the previous week until yesterday and that "we will not be able to go forward with tomorrow's hearing." Id. He stated that he had "not had a chance to review the documentation you provided nor to meet with Ms. Yow who we are having difficulties reaching and has been deemed an essential witness." Id. He stated that "the earliest I can be available will be Sept. 16 or 17." Id.

10(h). On September 9, 2026 at 7:16 a.m., Ms. Stephens responded that a delay "poses a number of operational and safety concerns." Declaration of Yesica Prado (ECF 341-1) ¶ 18 & Exhibit C.

11. Plaintiff brings this action in pro se. She asks that this Complaint be construed liberally, as pleadings drafted without counsel are held to less stringent standards than those drafted by lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4). This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

13. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and injunctive relief under Federal Rule of Civil Procedure 65.

14. Venue is proper under 28 U.S.C. § 1391(b)(2). All events occurred in the City of Berkeley, County of Alameda, California.

15. Under Civil Local Rule 3-2(c) and (d), this action arises in Alameda County and is properly

assigned to the San Francisco or Oakland Division.

16. This action is related, within the meaning of Civil Local Rule 3-12(a), to *Berkeley Homeless Union, et al. v. City of Berkeley, et al.*, No. 3:25-cv-01414-EMC (N.D. Cal.) (Chen, J.), which concerns the same course of encampment enforcement conduct and in which this Court has entered orders governing the City's ADA obligations.

## III. PARTIES

17. Plaintiff SUNNY JEAN YOW is an unhoused resident of the City of Berkeley, County of Alameda, California. She has lived outdoors in Berkeley since 2024. She is a person with a disability within the meaning of 42 U.S.C. § 12102 and 29 U.S.C. § 705(20).

18. Defendant CITY OF BERKELEY is a municipal corporation and a public entity within the meaning of 42 U.S.C. § 12131(1). It operates the Homeless Response Team, the Department of Public Works, the Berkeley Police Department, and Berkeley Animal Care Services.

19. Defendant THOMAS GREGORY is the City's ADA Program Coordinator. He is sued in his individual capacity.

19. Mike St. Pierre is the director of the City of Berkeley animal control unit.

20. Defendant PETER RADU is, on information and belief, an Assistant to the City Manager with responsibility that includes the animal shelter. He is sued in his individual capacity.

21. Defendants DOES 1 through 20 are City employees and agents whose identities are unknown to Plaintiff, including those who conducted the August 26, 2026 abatement, destroyed her property, arrested her, seized her telephone, and have held and threatened to destroy her dog. Plaintiff will amend to state their true names when ascertained.

22. At all relevant times each Defendant acted under color of state law and within the scope of

employment or agency with the City.

## IV. FACTUAL ALLEGATIONS

### A. Ms. Yow's disabilities

23. Ms. Yow is an adult survivor of childhood meningitis. She has mental health disabilities including PTSD and a brain injury.

24. Her disabilities affect her executive functioning, decision-making, and her ability to handle sudden changes and stressful situations. She has significant difficulty organizing information, planning multi-step tasks, keeping track of deadlines, and making decisions under stress.

25. When faced with sudden change or a high-pressure situation, her brain does not process information the way a person without her disabilities would. She becomes overwhelmed, she freezes, and she is unable to think clearly or act quickly.

26. She has been homeless and living outdoors in Berkeley since 2024, has experienced multiple displacements, and has had her property destroyed by the City on multiple occasions. She has not been able to recover mentally from these serial displacements.

### B. Griz

27. Griz is Ms. Yow's dog. He was born on her lap in her bed about five years ago. She had his mother and has raised him since birth.

28. Griz performs work and tasks for Ms. Yow. He alerts her to threats and physically guards her when the scent of a threat approaches. He helps her move about and pulls her cart with her belongings. He is trained as a livestock guardian and stays within a very small perimeter when off-leash, returning immediately when she calls him.

29. When Griz is not with her, Ms. Yow experiences what she describes as sharp darts piercing

her skin.

30. Griz is not a dangerous dog. He likes most people. He reacts negatively only when people are afraid of him or when he perceives a threat.

**C. The July 28 accommodation request and the City's July 29 assurance**

31. On July 28, 2026, through her Berkeley Homeless Union representative Yesica Prado, Ms. Yow submitted a written request for reasonable accommodations under Title II of the ADA to Defendant Gregory as the City's ADA Program Coordinator and to members of the City's Homeless Response Team.

32. The request identified her disabilities and their functional effects and sought several specific modifications, including a pause on enforcement pending completion of the interactive process, relocation assistance, additional time to move, and "Cognitive and Communication Accommodations."

33. On July 29, 2026, Defendant Gregory responded in writing that "the City will not proceed with the previously planned abatement reflected in the notice Ms. Yow received," and that "Ms. Yow will be provided with a new notice once the abatement is rescheduled and you are welcome to make a reasonable accommodation request at that time."

34. Defendant Gregory did not grant, deny, or otherwise determine any requested accommodation. He conducted no individualized assessment. The City never issued a written determination. The interactive process was never completed.

**D. Griz left Ms. Yow's camp before the abatement**

35. In or about February 2026, Ms. Yow moved to where a man she knew as Mr. Macy was living with his truck, because they depended on each other for survival. They began co-parenting Griz.

36. About a week before the August 26, 2026 abatement, Mr. Macy disappeared with Griz and did not communicate with Ms. Yow. She does not know when Griz was taken from her camp. She was told by unhoused neighbors that Mr. Macy did not want to face her.

37. Ms. Yow could not leave her campsite to look for Griz because she feared the abatement would occur at any moment in her absence and she would lose all of her belongings again.

38. Ms. Yow was not able to relocate before the abatement because Griz — the one who helps her move her belongings — was gone, and without him she had no help.

**E. The August 26, 2026 abatement, arrest, and destruction of property**

39. On the morning of August 26, 2026, Berkeley police came to Ms. Yow's encampment. They put on rubber gloves and prepared to remove her. She asked whether she was being arrested and was told something about "illegal lodging."

40. During the sweep her encampment was destroyed. The City obliterated her found-object bureau — her art and her exhibits. It took everything.

41. Ms. Yow's dog Briggitte was impounded during the sweep.

42. During the abatement Ms. Yow asked for a mental health professional to come and communicate with her, consistent with the "Cognitive and Communication Accommodations" requested in July. No help was ever offered to address her situation, her needs, or her disabilities.

43. Berkeley Police seized Ms. Yow's cell phone incident to her arrest. The seizure of her telephone eliminated the means by which she could be reached and by which she could reach her representatives.

**F. The City never told Ms. Yow that Griz had been impounded**

44. After the abatement Ms. Yow was released from the Berkeley Jail. No one notified her that

her dogs had been impounded. Days passed and no one from the City came to tell her that Griz had been taken.

45. Ms. Yow heard through other unhoused people and advocates that Griz had been taken to the shelter and had been scheduled for euthanasia before she ever knew he was there.

46. She was then told that Griz had been held long enough that, because she had not responded, he had already been euthanized. She spent a week grieving. She said, "Can't they just euthanize me?" rather than face the loss.

47. Ms. Yow did not receive notice of the "vicious and dangerous" determination from the City. She learned of it only when her Union representative gave her a copy of the letter on September 5, 2026.

48. The City's letter did not state a hearing date or time.

**G. The City's attempt to obtain a waiver of counsel**

49. On September 9, 2026, Ms. Yow went to the animal shelter, arriving about 2:30 p.m. She learned there that the hearing had been postponed to Thursday, September 10. Before closing, staff told her the papers for Griz were ready.

50. A man later identified to her as Defendant Peter Radu, Assistant to the City Manager, gave her a packet of papers.

51. Looking at the photographs in the packet, Ms. Yow said, "Those are not my dogs. Those are Akita dogs," and of another, "That one looks like my Griz, but I don't have a service harness like that." The information the City provided her about Griz was not accurate.

52. Defendant Radu then gave Ms. Yow a document to sign — a waiver that would have prevented her from having legal counsel. He handed it to her three times. He pushed it at her. He

sought to remove her counsel from appearing on her behalf.

53. Defendant Radu already knew that Anthony Prince was Ms. Yow's lawyer, because Mr. Prince had contacted the City, yet he asked her anyway.

54. Ms. Yow told Defendant Radu that Mr. Prince was her lawyer but that because the City had taken her phone she had not been able to reach him. She understood Defendant Radu to be taking advantage of her lack of a telephone, and he continued to press the waiver.

55. Ms. Yow refused, telling him, "No way, man. I'm not signing this," and handed it back. He attempted twice more.

56. Ms. Yow then asked to see Griz. Defendant Radu refused, saying it would cause the dog more stress. She tried to give Defendant Radu Griz's collar and harness, and he declined.

57. The City was unwilling to let Ms. Yow see her dog on the ground that it would cause him stress, while preparing to kill him.

**H. The September 10, 2026 hearing**

58. On September 10, 2026, Ms. Yow attended the administrative hearing out of desperation, because she does not want the City to kill her dog. Her counsel attended, as did the Union President.

59. Her counsel had asked the City and this Court to reschedule the hearing by a few days so that he could prepare, having been unable to reach Ms. Yow.

60. When the hearing officer said he would not wait and attempted to begin, Ms. Yow panicked. She began crying and begging the City not to kill her dog. She had brought a muzzle she would use on Griz if he were released to her. She was very upset and not thinking straight.

61. That is the precise outcome the requested accommodations were intended to prevent. The

City had been told in writing, twice, that Ms. Yow's disabilities impair her functioning under sudden pressure. It proceeded anyway.

62. The City has never offered Ms. Yow any assistance to care for Griz. It has not offered her a place to stay with him. It has not offered her resources to comply with the dog ordinance. It has only threatened to euthanize him.

63. [COMPLETE BEFORE FILING: state the outcome of the September 10 hearing, whether the determination was upheld, whether any euthanasia order has issued, and Griz's present status and location.]

**I. Policy, custom, and ratification**

64. The conduct alleged reflects a pattern and practice of the City of conducting encampment enforcement against disabled unhoused residents without completing the interactive process required by Title II, and of destroying the personal property of unhoused residents without adequate notice or an opportunity to be heard.

65. This Court has previously found, in *Berkeley Homeless Union v. City of Berkeley*, No. 3:25-cv-01414-EMC, that the City "may not summarily conclude that a requested accommodation is unreasonable without undergoing this investigative process." Dkt. 288 at 21.

66. The acts and omissions alleged were undertaken, directed, or ratified by officials with final policymaking authority for the City, including the City Manager or designee, who under BMC § 10.04.172 holds authority to order the destruction of a dog.

## V. CAUSES OF ACTION

**FIRST CAUSE OF ACTION — Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (Against the City of Berkeley)**

67. Plaintiff incorporates each preceding paragraph.

68. Ms. Yow is a qualified individual with a disability under 42 U.S.C. §§ 12102 and 12131(2). The City is a public entity under § 12131(1). Its encampment enforcement program, property procedures, and animal control and administrative hearing processes are services, programs, or activities of a public entity.

69. A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," absent a fundamental alteration. 28 C.F.R. § 35.130(b)(7)(i).

70. The City failed to make reasonable modifications, including by never determining the July 28 request; abating her encampment after assuring her representative it would not; refusing the mental health professional she asked for during the abatement; refusing a short continuance of a hearing at which her dog's life was at stake; refusing to accept an accommodation request from her designated representative and counsel; and refusing to engage in the interactive process at all.

71. Griz is a service animal within the meaning of 28 C.F.R. § 35.104 — a dog individually trained to do work and perform tasks for the benefit of an individual with a disability. He alerts Ms. Yow to threats, guards her, assists her movement, and pulls her cart. No certification or professional training is required. *See C.L. v. Del Amo Hosp., Inc.*, 992 F.3d 901, 908–11 (9th Cir. 2021). Plaintiff's reasonable-modification claim does not depend on that classification.

72. Once on notice, a public entity must undertake a fact-specific investigation and give primary consideration to the requested accommodation. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001), *as amended*. The City did neither.

73. The City acted with deliberate indifference. It knew harm to Ms. Yow's federally protected

rights was substantially likely and failed to act on that likelihood. *Id.* at 1138–39.

74. The City is liable for the acts of its employees under Title II on a respondeat superior basis. *Id.* at 1141.

**SECOND CAUSE OF ACTION — Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Against the City of Berkeley)**

75. Plaintiff incorporates each preceding paragraph.

76. Ms. Yow is an otherwise qualified individual with a disability under 29 U.S.C. § 705(20).

77. On information and belief, the City receives federal financial assistance, including [IDENTIFY THE ACTUAL FUNDING STREAMS BEFORE FILING — HUD Continuum of Care, Emergency Solutions Grants, CDBG, or DOJ grants, from the City's adopted budget or USASpending.gov], and the programs at issue are conducted by a department or instrumentality of a local government receiving such assistance. 29 U.S.C. § 794(b).

78. The City excluded Ms. Yow from participation in, denied her the benefits of, and subjected her to discrimination under those programs solely by reason of her disability, with deliberate indifference.

**THIRD CAUSE OF ACTION — 42 U.S.C. § 1983, Fourth Amendment (Against All Defendants)**

79. Plaintiff incorporates each preceding paragraph.

80. Ms. Yow's personal property and her dog are "effects" within the meaning of the Fourth Amendment. A dog "is an 'effect' or 'property' which can be seized," and "[t]he killing of the dog is a destruction recognized as a seizure under the Fourth Amendment." *Fuller v. Vines*, 36 F.3d 65, 68 (9th Cir. 1994), *overruled in part on other grounds by Robinson v. Solano County*, 278

F.3d 1007 (9th Cir. 2002) (en banc).

81. The Fourth Amendment protects the unabandoned property of unhoused persons against unreasonable seizure and destruction. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027–30 (9th Cir. 2012); *Recchia v. City of L.A. Dep't of Animal Servs.*, 889 F.3d 553, 559–64 (9th Cir. 2018).

82. On August 26, 2026 Defendants seized and destroyed Ms. Yow's tent, belongings, artwork and art supplies without a warrant, without exigency, and without any reasonable basis.

83. Defendants continue to hold Griz and threaten to destroy him. The continued seizure and threatened destruction are unreasonable. Griz is confined and poses no danger to the public, and Defendants have had weeks to consider alternatives and have adopted none but destruction. *See San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975–78 (9th Cir. 2005).

84. The City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), by official policy or longstanding custom, by failure to train amounting to deliberate indifference, and by the decisions and ratification of officials with final policymaking authority. *See Rodriguez v. County of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018).

**FOURTH CAUSE OF ACTION — 42 U.S.C. § 1983, Fourteenth Amendment Procedural Due Process (Against All Defendants)**

85. Plaintiff incorporates each preceding paragraph.

86. Ms. Yow has a protected property interest in her belongings and in her dog. *Recchia*, 889 F.3d at 565–68; *Phillips v. San Luis Obispo County Dep't of Animal Regulation* (1986) 183 Cal. App. 3d 372.

87. Defendants destroyed her property on August 26, 2026 without notice and without any

opportunity to be heard. "The government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Lavan*, 693 F.3d at 1032.

88. Defendants set in motion a proceeding to destroy Griz without giving Ms. Yow notice that he had been impounded at all, without notice reasonably calculated to reach her, and by a letter that contained no hearing date or time. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

89. Defendants compounded the deprivation by pressing Ms. Yow to waive her right to counsel while she was without a telephone the City had seized, and by denying her access to the animal whose fate was to be decided.

90. Each *Mathews* factor favors Ms. Yow. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The private interest is the life of an irreplaceable working animal on which a disabled person depends. The risk of erroneous deprivation is demonstrated by the City's own packet, which contained photographs of dogs that are not hers. The additional safeguards sought — actual notice, a short continuance, and the accommodations already requested — are nearly costless. The government's interest is minimal because Griz is confined.

91. No post-deprivation remedy can cure the destruction of a living animal. *Cf. Recchia*, 889 F.3d at 568 n.9.

92. The City is liable under *Monell*, 436 U.S. 658, on the grounds stated above.

**FIFTH CAUSE OF ACTION — Declaratory and Injunctive Relief (Against All**

**Defendants)**

93. Plaintiff incorporates each preceding paragraph.

94. An actual controversy exists concerning whether the City may destroy Griz on the basis of proceedings conducted without notice to Ms. Yow and without the accommodations the ADA requires, and whether the City's encampment enforcement practices as applied to disabled unhoused residents comply with federal law.

95. Plaintiff has no adequate remedy at law. The destruction of Griz would be irreversible.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For a temporary restraining order, preliminary injunction, and permanent injunction barring Defendants and all persons acting in concert with them from euthanizing, destroying, transferring, adopting out, or otherwise disposing of the dog Griz;

2. For an injunction requiring Defendants to complete the interactive process and issue a written determination on Plaintiff's accommodation requests before any further proceedings concerning Griz;

3. For an injunction requiring Defendants to afford Plaintiff actual notice, a meaningful opportunity to be heard with the assistance of counsel, and the reasonable modifications necessary for her to participate;

4. For an order requiring Defendants to maintain Griz in safe and humane custody and to permit Plaintiff to visit him;

5. For a declaration that Defendants' acts and omissions violated Title II of the ADA, § 504 of the Rehabilitation Act, and the Fourth and Fourteenth Amendments;

6. For compensatory damages according to proof;

7. For punitive damages against the individual Defendants according to proof, as permitted by law;

8. For costs of suit, and for reasonable attorney's fees under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a in the event Plaintiff obtains counsel;

9. For prejudgment interest; and

10. For such other and further relief as the Court deems just and proper.

Dated: September ___, 2026

Respectfully submitted,

Sunny Jean Yow
_______________________________

SUNNY JEAN YOW

Plaintiff in Pro Se

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable. Fed. R. Civ. P. 38(b).

Dated: September ___, 2026

_______________________________

SUNNY JEAN YOW

Plaintiff in Pro Se